# UNITED STATES DISTRICT COURT

for the

District of New Mexico

FILED

UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

NOV – 4 2024

MITCHELL R. ELFERS
CLERK OF COURT

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

2775 Night Owl Lane, Anthony, New Mexico 88021
("Subject Premises")

)
)
)
)
)
)

Case No. 24 MR 2044

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached and fully incorporated.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B, which is attached and fully incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Possession with intent to distribute a controlled substance and conspiracy. |
| 18 U.S.C §§ 922 and 924(c) | Felon in possession and possession of firearm in furtherance of drug trafficking |

The application is based on these facts:

See Attachment C, which is attached and fully incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Chandler Rule, DEA Special Agent**
*Printed name and title*

Sworn to before me ~~and signed in my presence.~~ via telephone.

Date: _____ 11/04/2024 _____

_____
*Judge's signature*

City and state: Las Cruces, New Mexico

**Kevin R. Sweazea, U.S. Magistrate Judge**
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is 2775 Night Owl Lane, Anthony, New Mexico 88021 hereinafter "the Subject Premises," further described as a red trailer with a gray roof. A photograph of the Subject Premises appears below.



The search of the above Subject Premises shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the Subject Premises, the RV/camper trailer located on the Subject Premises, all persons located on the Subject Premises, and all vehicles associated with Antonio Valles that are located on the Subject Premises in or on which the items to be seized could be concealed.

## ATTACHMENT B

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. § 841 and 846 and 18 U.S.C. §§ 922 and 924 involving Antonio Valles and his co-conspirators, including:

1. Any cellular telephones, SIM cards, digital tablets, personal digital assistant (PDA) devices or other communication devices, including Valles' cellular phone which was seized by law enforcement at the time of Valles' November 4, 2024, arrest at the Subject Premises, and any and all information stored on such communication devices, including:

   a. Phone numbers, names, usernames, email addresses, residential addresses, and other identifying information of customers, distributors, sources of supply, and other associates of the user of the communication devices;

   b. Audio and video calls made to or from the communication devices, along with the duration and date and time each such communication occurred;

   c. Any message logs or messages, whether sent from, to, or drafted on the communication devices, along with the date and time each such communication occurred;

   d. The content of voice mail messages and audio and video messages stored on the communication devices, along with the date and time each such communication occurred;

   e. Photographs or video recordings;

   f. Information relating to the schedule, whereabouts, or travel of the user of the communication devices;

   g. Information relating to other methods of communications, including the contents of those communications, utilized by the user of the communication devices and stored on the communication devices;

   h. Bank records, checks, credit card bills, account information and other financial records; and

   i. Evidence of user attribution showing who used or owned the communication devices, such as social media accounts, email addresses, messages, location information, photographs and videos, phonebooks, saved usernames and passwords, documents, and internet browsing history;

2. Records relating to the importation, distribution, and possession of controlled substances, including, but not limited to books, records, receipts, cell phones, cell phone records, notes, ledgers, notebooks, border crossing documents, designated codes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances;

1

3.  Papers, tickets, notes, schedules, receipts including bill of sales for vehicles, registration and licensing of vehicles, license plates, vehicle titles, registration, documents, stickers, and other proof of ownership and tax compliance, driver's license, or proof of insurance and liability;

4.  Financial documents, including but not limited to, credit card statements, tax returns, safe deposit records, safe deposit keys, bank records, bank statements, money orders, Western Union receipts, checking account records, cashier's checks, passbooks and other items evidencing the obtainment, concealment and/or expenditure of money or assets;

5.  Identification and personal records including address books, telephone directories, calendars, diaries, social security cards, lists of names, social security numbers and other personal identification, telephone and address books or papers of individuals involved in the trafficking of controlled substances;

6.  Photographs, video recordings, slides, digital files, DVDs, CD-Rs, or other media containing images or video of individuals involved in the trafficking of controlled substance which demonstrate his/her involvement in drug trafficking as well as other notes, records, diaries, journals, emails, blog entries, which demonstrate involvement in drug trafficking;

7.  Proceeds of an unlawful activity, including but not limited to, United States currency, jewelry, vehicles and other assets or financial records related thereto;

8.  Documents, books and papers reflecting names, addresses and/or telephone numbers and lists pertaining to individuals involved in the trafficking of controlled substances;

9.  Diaries, purchase records, cash receipts and disbursement journals, inventory records and other records relating to the operation of controlled substance sales, repackaging, and redistribution in violation of 21 U.S.C. 841 and 846;

10. United States currency, currency counting machines, precious metals, jewelry, financial instruments including stocks and bonds, and all other items of value, and all sales receipts for items of value, that evidence the proceeds from the smuggling, transporting or distribution of drugs.

11. Devices or objects utilized to account for proceeds related to violation of violation of 21 U.S.C. §§ 841 and 846, including but not limited to currency counting machines;

12. Controlled substances, drug paraphernalia, and packaging materials, including scales, plastic baggies, vacuum sealing machines, and tape;

13. Firearms and ammunition as defined by Title 18 USC Section 921, documents relating to the purchase or possession of firearms, and items related to firearms, such as holsters, magazines, and ammunition boxes;

14. Valid or false identification documents, including drivers' licenses, social security cards, state identification cards and foreign identification documents;

15. Bills, notes, contracts, or other documents reflecting the ownership, subscription information or use or control of one or more telephones, vehicles, or the location to be searched;

16. Surveillance systems, including digital video surveillance and any stored surveillance video;

17. Safes, lock boxes, or other locked containers, in which the items in paragraphs 1 through 16 could be concealed; and

18. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in paragraphs 1 through 16.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

This warrant authorizes a review of all electronic media seized pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The warrant also authorizes a review of all electronic media for evidence of who used, owned, or controlled the electronic media at the time the things described in this warrant were created, edited, or deleted. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, law enforcement may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual who is found at the Subject Premises 1-5 and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

## ATTACHMENT C - AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Chandler Rule, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for warrant to search the premises known as 2775 Night Owl Lane, Anthony, New Mexico, 88021, hereinafter as "the Subject Premises," further described in Attachment A, for the things described in Attachment B.

2.  I am a Special Agent with the Drug Enforcement Administration (DEA) (the "Investigative Agency") and have been since December 2021. As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and to make arrests for criminal offenses, to include those enumerated in 18 U.S.C. § 2516. Prior to becoming a Special Agent with DEA, I was employed as a Trooper with the Kansas Highway Patrol from 2016 to 2021. During my career as a law enforcement officer and narcotics agent, I have conducted and assisted with numerous criminal investigations concerning violations of the Controlled Substances Act, I and have received ongoing training in conducting such investigations. Through my training, education, and experience, I have become familiar with the manner in which drug trafficking organizations operate.

3.  My experience as a narcotics agent includes, but is not limited to: conducting physical surveillance, interviewing witnesses, writing affidavits for and executing search warrants, working with undercover agents and informants, issuance of administrative and federal grand

jury subpoenas, analysis of phone toll and financial records, and analysis of data derived from the use of pen registers, trap and traces, and wiretaps.

4.     I have been involved in an ongoing investigation regarding the distribution of controlled substances in violation of 21 U.S.C. §§ 841 and 846, specifically methamphetamine and fentanyl, in and around Las Cruces, New Mexico. I, as well as other Special Agents and Task Force Officers with the DEA and Homeland Security Investigations (HSI), together with law enforcement officials from other agencies, have obtained information regarding the illegal drug trafficking activities of Antonio Valles ("Valles"), Daniel Herrera ("Herrera"), Veronica Levario ("Levario"), and others (the "Subjects").

5.     I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation. In addition, I have developed information I believe to be reliable from additional sources including:

      a.   Information provided by Task Force Officers ("TFO"), Special Agents ("SA"), and Intelligence Research Specialists (IRS) of the DEA and HSI, and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

      b.   Wiretap intercepts and other lawfully obtained recorded conversations;

      c.   Results of physical surveillance conducted by agents during the investigation;

      d.   A review of telephone toll records and subscriber information;

      e.   Information derived from consensually recorded conversations;

      f.   A review of driver's license and automobile registration records; and

      g.   Records from commercial databases.

6.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

7.    I believe there is probable cause that the Subjects have committed, are committing, and will continue to commit offenses involving violations of 21 U.S.C. §§ 841 and 846 – Conspiracy to distribute and possession with intent to distribute controlled substances and 18 U.S.C. §§ 922 and 924(c) – Felon in possession of a firearm and ammunition and the possession of a firearm in furtherance of a drug trafficking crime.

## EVIDENCE SOUGHT DURING SEARCH

8.    Based on my training, experience and participation in this and in similar investigations, I know that:

    a.    individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings.  They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.  Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other

contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

b.   Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

c.   Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

d.   Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators.  These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and

purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

e.    Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas. These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

f.    Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

g.    Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence

potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

h.   Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

i.   Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs. To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

j.  Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

k.  The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-described devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and

communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

l.   Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

m.  Drug traffickers often maintain firearms, including rifles, shotguns, and handguns, and ammunition on their person or in their homes, businesses, or cars to protect themselves and their drugs and their drug profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

n.   Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the

distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

o.    Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

p.    Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the Subject Premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These

documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

9.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium. Collectively, the terms "computer," "digital media," and "storage media" are referred to as "electronic media."

10.    A list of items agents seek authority to seize is in Attachment B.

## ELECTRONIC MEDIA AND FORENSIC ANALYSIS

11.    As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the Subject Premises, in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on electronic media.  For this reason, I submit that if a computer, digital medium, or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer, digital medium, or storage medium. Thus, the warrant applied for would authorize the seizure of electronic media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

12. Necessity of seizing or copying entire electronic media:  In most cases, a thorough search of a Subject Premises for information that might be stored on electronic media often requires the seizure of the physical electronic media and later off-site review consistent with the warrant. In lieu of removing electronic media from the Subject Premises, it is sometimes possible to make an image copy of electronic media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

    a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on Subject Premises could be unreasonable. Electronic media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b. Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Subject Premises.  However,

taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of electronic media formats that may require off-site reviewing with specialized forensic tools.

d.  Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

13.  The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to the requested warrant.  I seek this authority based on the following:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition

features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.    If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a

device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under the requested warrant are not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by the requested warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or (2) when the device has not been unlocked using a fingerprint for four hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of

the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a Subject Premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.    Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to the requested warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; and (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by the requested warrant.

**PROBABLE CAUSE**

14.    DEA and HSI Special Agents and other law enforcement officers are currently investigating a Drug Trafficking Organization (DTO) which operates in New Mexico, Texas, and elsewhere that distributes methamphetamine, cocaine, and fentanyl.

15.     Beginning in March 2024, and ending in October 2024, the Honorable United States District

Judge Kenneth J. Gonzales signed five separate orders in the District of New Mexico

authorizing the interception of wire and electronic communications for a total of 13 telephones,

being utilized by eight different members of the DTO. Based on the intercepted

communications, agents confirmed that Valles distributes methamphetamine, cocaine, and

fentanyl in New Mexico and Texas.

16.     On April 3, 2024, at 2:58 p.m., Veronica Levario ("Levario") spoke with Valles. During the

conversation, Levario asked, "Uh, if I were to buy a QP, um, would you make them at 28?"

When Valles expressed disbelief at a "QP" for "28," Levario clarified, "28 a piece." Valles

stated, "I'll leave it for, I'll leave it for…650 and stated, "and I'll do them 28 for you." Levario

then indicated that she wanted it, and Valles told Levario to let him know when she was going

to go. Based on my training, experience, and knowledge of this investigation, I believe that

Levario was asking Valles if Levario purchased a quarter pound (four ounces) of

methamphetamine from Valles if Valles would make sure that each ounce weighed a full 28

grams. I know that drug traffickers sometimes weigh drugs in what is referred to as a

"Mexican ounce," which is only 25 grams per ounce instead of the true weight of 28 grams per

ounce. I believe that Valles agreed to ensure that each ounce weighed 28 grams and stated that

he would sell the four ounces of methamphetamine to Levario for $650.

17.     Approximately an hour later, at 4:06 p.m., on April 3, 2024, Daniel Herrera ("Herrera") called

Levario. During the call, Levario stated, "Hi. Uh, what was I gonna say? Oh, Tony said he

would do a four of 28 each one for 650." Herrera responded, "Yeah. Tell him I'll do that, but,

uh, but, uh, I'm gonna weigh them though. In the time I need the 70 that he was short too."

Based on my training, experience, and knowledge of this investigation, I believe that Levario

was telling Herrera that she had spoken with Valles and that Valles would sell four ounces of methamphetamine each weighing 28 grams for $650 dollars. Additionally, I believe Herrera was indicating that he intended to weigh the methamphetamine and that Herrera had obtained narcotics from Valles in the past and had not been as large of quantity as he was expecting. I further believe that Herrera was saying that he wanted Valles to make up for the previous shortage when he provided the four ounces of methamphetamine that they were discussing in this call.

18.     Several hours later, between 8:13 p.m. and 8:19 p.m. on April 3, 2024, Levario and Valles exchanged text messages in which Levario stated, "Hey were on our way to u were passing mesquite." Valles responded, "Damn. U should of called me before u came. Let me see if I can complete." Valles then stated, "complete I told u never listen and first time u actually come through u slways ask and say u coming and nothing." Levario replied, "For reals for reals??? But I kind did call u and told yea so what do u have." Based on my training, experience, and knowledge of this investigation, I believe that Levario was telling Valles that Levario and someone else were getting close to Valles' house to pick up the requested methamphetamine. I believe that Valles was telling Levario that he wasn't sure if he had all of the methamphetamine that Levario wanted to purchase but that he would check.

19.     Shortly thereafter, at 8:21 p.m. on April 3, 2024, Levario spoke with Valles. During the conversation, Valles stated, "Because I sold, sold, sold a chunk. Let me see if I can complete it." Later in the conversation, Valles stated, "Let me go see, I wanna, I wanna see, I wanna see if I'm gonna have the 28." Valles added, "All right, but yeah, I'll complete a regular one" and said that he would check. Valles then stated, "All right. Come by, where are you right now?" and Levario responded, "Uh… Getting, uh, getting to Anthony." Based on my training,

experience, and knowledge of this investigation, I believe that Valles was telling Levario that

he had already sold a portion of the methamphetamine that he had for sale and that he wanted

to see if he had a full ounce of methamphetamine left to sell Levario.  I believe that Valles then

determined that he did have the ounce of methamphetamine to sell Levario, and that Levario

told Valles that she was almost to Anthony, Texas, which is close to where Valles was living in

Canutillo, Texas.

20.    On May 16, 2024, between approximately 7:41 p.m. and 10:40 p.m., Valles and "Monica"

exchanged text messages in which Monica stated, "I have 200 to pay you back and 1100 to get

a boat can I do that here in a bit pis c."  Valles responded that he had just got back and said, "I

have what u need."  When Monica didn't respond right away, Valles sent her a text stating, "or

did u get already if u did im still expecting those 200 monica and well u been slow on sending

wat u owe me and well if u got wat u needed then when can I expect those 200 can u tell me?"

Based on my training, experience, and knowledge of this investigation, I believe that Monica

was offering to pay Valles $200 that she owed him for unknown type of narcotics that he had

previously provided to Monica.  I further believe that Monica was asking to purchase an

additional 1,000 fentanyl pills for $1,100.  I believe that Valles was indicating that he had the

fentanyl pills to sell to Monica but, when there was a pause in their text exchange, that Valles

was also telling Monica that if she had bought the fentanyl pills from someone else that she

still owed Valles $200 for the previously supplied narcotics.

21.    On May 18, 2024, at approximately 3:29 p.m., Herrera called Valles.  During the call, Valles

said, "When you're coming, call me when you are on your way. [U/I] I'll send you."  Herrera

responded "Ok" and asked if the price was still the same.  Valles asked what the price had

been, and Herrera stated, "No, well… Well, it used to be, was, the whole one for 1,000. And

then last time it was twelve hundred." Valles said that the price would still be the same and that "it" was good. Valles added, "half, so you can check it out," and Herrera responded, "Okay, uh… Mm, I'm going to need [clears throat] one whole one." When Valles was non-committal, Herrera stated, Uh, let me just, just give me like half an hour or something like that. Let me just… I just fucking woke up. So, they are bug…" Herrera then said he was going to get up and would call Valles so that Herrera could go to Valles' location. Based on my training, experience, and knowledge of this investigation, I believe that Valles and Herrera were discussing where they were going to meet so that Valles could provide Herrera with fentanyl pills. I believe that Herrera was asking if the price would be the same as the it had been in a prior transaction, and that he was asking if it would be $1,000 or $1,200 for 1,000 fentanyl pills. I further believe that Valles was saying that it would be the same price but was saying that Valles would only be supplying Herrera with 500 fentanyl pills. I believe that Herrera reiterated that Herrera needed 1,000 fentanyl pills and said that he would head toward Valles' location.

22.     Approximately 75 minutes later, at 4:45 p.m. on May 18, 2024, Herrera, called Valles. During the call, Herrera said that he was going to head toward Valles' location. Valles said that he had to go to Las Cruces, and the two eventually agreed to meet at the outlet mall off of I-10 between El Paso and Las Cruces.

23.     Following the interception of the above calls between Valles and Herrera, agents observed via the pole camera on Valles's residence that someone entered a white Audi that was parked at Valles's residence and left the residence. While agents were not able to see the person well enough to identify him, based on the investigation, I believe that the person who left in the Audi was Valles. A short time later, agents observed the Audi meet with Herrera's vehicle at

the outlet mall. Agents could not see exactly what happened during the meeting, but, shortly after the meeting, Herrera got back on the Interstate, heading toward Las Cruces, NM. Just before the state line, agents stopped Herrera's vehicle for speeding. Monique Garcia, Herrera's wife/girlfriend, was the driver of the vehicle, and Herrera was the passenger. During the traffic stop, officers asked both Herrera and Garcia to exit the vehicle. When Herrera got out of the passenger seat, there were numerous fentanyl pills on the passenger seat. Herrera advised officers that he had additional fentanyl pills hidden on his person. Herrera was asked to remove the pills, and he removed several fentanyl pills from his buttock's region. Herrera also extracted additional pills he had hidden inside his tennis shoe. Agents also recovered additional fentanyl pills from a Twisted Tea can which was on the floorboard behind the rear passenger seat. The total weight of the seized fentanyl pills was 66.89 net grams (519 fentanyl pills).

24. Agents interviewed Herrera, and Herrera admitted to having just picked up 500 fentanyl pills (which he described as "half a boat") from someone that he knew only as Tony (Valles) and that he had paid $2 a pill. Herrera stated that Tony is known as a supplier for fentanyl pills. Herrera further stated that he was supposed to provide half of the 500 pills to someone else after he returned to Las Cruces. Herrera and Garcia were released at the conclusion of the traffic stop.

25. On June 6, 2024, at 9:40 p.m., Valles received a call from an individual identified as Lidia Rodriguez ("Rodriguez"). During the call, Valles asks what Rodriguez needed. Rodriguez responded 25, and Valles said ok. On that same day, at approximately 9:46 p.m., Valles received a text message from CashApp using phone number 833-417-2274 stating that "Lidia Rodriguez sent you $25." Based on my training, experience, and knowledge of this

investigation, I believe that Valles sold Rodriguez $25 dollars' worth of narcotics and that Rodriguez paid for the narcotics via CashApp.

26. On June 7, 2024, at 12:18 a.m., Valles received a call from an individual identified as Jerry. During the call, Jerry asked where Valles was, and Valles replied that he was heading over to Zaragoza to pick "them" up. Valles then told Jerry to go over there, and Jerry replied that he just arrived. Based on my training, experience, and knowledge of this investigation, I believe that Valles was indicating that he was heading to the Zaragoza St. area in El Paso to pick up additional narcotics and that he agreed to meet with Jerry afterwards to provide narcotics to Jerry.

27. Using the phone location information Valles' telephone, agents were able to locate Valles at a residence located at 1005 N. Zaragoza Road in El Paso, Texas. Agents began conducting surveillance. When Valles left the residence in the early morning hours of June 7, 2024, agents had Texas officers do a traffic stop of Valles, who was alone in his white Audi sedan. A traffic stop was conducted on the Audi, and officers confirmed that Valles was driving the vehicle. A canine was deployed, and the canine alerted on the Audi. During the traffic stop, agents searched Valles's vehicle and found 345.3 net grams of pure methamphetamine and 139.8 net grams of fentanyl (1,279 fentanyl pills) inside a brown bag in the trunk of the vehicle. Agents also located an ammunition can that contained large amounts of ammunition and loaded ammunition magazines, along with a BB/pellet gun that resembled a handgun. Valles did not make any statements to officers and was released from the scene of the traffic stop.

28. On October 16, 2024, a Grand Jury from the District of New Mexico indicted Valles, and 13 others, in a 92-count indictment charging numerous drug-trafficking crimes, including

conspiracy to distribute controlled substances. Based on the Grand Jury indictment, a warrant for Valles arrest was issued.

29.     In the early morning of November 4, 2024, agents attempted to locate and arrest Valles. Agents conducted surveillance at the Subject Premises and observed two vehicles, an orange motorcycle and a blue Chevrolet Avalanche. Agents had previously observed these two vehicles coming and going from a storage unit that Valles frequently visits. Based on the movements of the vehicles, agents believe that Valles frequently drives both of the vehicles.

30.     On the same day, agents approached the Subject Premises and knocked on the front door. An individual, who will be referenced as Source of Information-1 ("SOI-1"), answered the door and agreed to speak to agents. SOI-1 told agents that a male individual was inside the residence. Agents provided a picture of Valles to SOI-1. SOI-1 then told agents that the person in the photograph was the same male inside the residence.

31.     Agents then surrounded the house and began announcing their presence and asked for Valles to exit the residence. After a reasonable amount of time, agents entered the Subject Premises. While inside the residence, agents observed Valles exit a back room of the Subject Premises holding a black handgun to his head. Valles asked agents to kill him and threatened to shoot himself. After a short period of time, agents used a less than lethal device to gain compliance from Valles. Valles was then taken into custody. While agents were attempting to arrest Valles, agents observed two additional rifles inside the bathroom, which was next to the bedroom (which did not contain a bed) where Valles was originally located. Agents also observed multiple rifle magazines, a cellular telephone, and a bullet proof vest on a bed in the living room.   At the time of Valles' arrest, agents seized the cellular telephone.

32.   After Valles was arrested, another individual ("SOI-2") arrived at the Subject Premises.  SOI-2 told agents that Valles had been staying at the Subject Premises for approximately two weeks. SOI-2 stated that Valles was supposed to be living on an RV that was on the property of the Subject Premises.   However, based on finding Valles and his belongings inside the main residence on the Subject Premises, I believe that Valles was inhabiting both the main residence and the RV trailer on the Subject Premises.

33.   In addition to the firearms, agents observed drug paraphernalia, specifically, a pipe used to consume drugs, in between the living room and the kitchen of the Subject Premises.

34.   Valles is a convicted felon and is prohibited from possessing firearms. In 1996, Valles was convicted for Possession with intent to distribute marijuana, a felony conviction.

## CONCLUSION

35.   I submit that this affidavit supports probable cause for warrant to search the Subject Premises described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,
Chandler Rule
Special Agent
Drug Enforcement Administration

Electronically signed and telephonically sworn
on November 4, 2024:

KEVIN R. SWEAZEA
UNITED STATES MAGISTRATE JUDGE